STATE of Wisconsin, Plaintiff-Respondent,

v.

Kent A. DENNY, Defendant-Appellant.†

Court of Appeals

*No. 83–1856–CR. Submitted on briefs July 6, 1984.—*
*Decided September 19, 1984.*
(Also reported in 357 N.W.2d 12.)

† Petition to review denied.

For the appellant, the cause was submitted on the briefs of *Kenneth L. Lund,* assistant state public defender.

For the respondent, the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Barry M. Levenson,* assistant attorney general.

Before Scott, C.J., Brown, P.J., and Robert W. Hansen, Reserve Judge.

BROWN, P.J.   Kent A. Denny was convicted of first-degree murder following a jury trial in which his brother was a co-defendant.  Denny raises three issues on appeal.  First, he argues that he and his brother should have been tried separately.  Second, Denny complains he was denied his constitutional right to present a defense when the trial court refused to allow evidence suggesting that any one of a number of third parties had motive and opportunity to murder Christopher Mohr and that he was also denied the opportunity to produce evidence showing that he has a tendency to fabricate stories.  Third, Denny asserts that the trial court erred in refusing to allow defense counsel to review police investigation reports he claims would have supported his theory that others could have killed the victim.  We are unpersuaded by any of Denny's arguments and affirm.

Christopher Mohr was found dead on January 26, 1982.  An autopsy revealed that Mohr had been stabbed fifty-seven times and had bruises on his head.  Police investigation ultimately centered on Kent and Jeff Denny.  Both of them had made various inculpatory remarks concerning the murder to a third brother, as well as to friends and acquaintances.  After a jury trial, Kent and Jeff Denny were convicted of first-degree murder.  Further facts will be presented as necessary.

## *SEVERANCE*

Kent Denny claims that the trial court erred when it refused to sever his trial from that of his co-defendant

brother. He maintains that severance was mandated because the state intended to introduce testimony of inculpatory statements by his co-defendant. When reviewing a denial of a motion for severance, our standard of review is whether the trial court abused its discretion. *Cranmore v. State,* 85 Wis. 2d 722, 755, 271 N.W.2d 402, 419 (Ct. App. 1978).

Denny bases his argument for severance on the ruling of the United States Supreme Court in *Bruton v. United States,* 391 U.S. 123 (1968), as codified in sec. 971.12(3), Stats. The Court in *Bruton* held that severance is warranted where a co-defendant's statement will necessarily implicate another co-defendant. In a subsequent United States Supreme Court case, *Parker v. Randolph,* 442 U.S. 62 (1979), the *Bruton* rule was modified. A plurality in *Parker* held that the admission of interlocking confessions, with proper limiting jury instructions, did not violate the defendant's right of confrontation guaranteed by the sixth and fourteenth amendments. *Id.* at 75. Interlocking inculpatory statements are those statements that clearly demonstrate the involvement of each defendant as to crucial facts such as time, place and activity and an awareness of an overall plan or scheme. *Id.* at 67–68.

Here, the trial court decided that the rule in *Parker* controlled this situation because the prosecution intended to present testimony of interlocking inculpatory statements by both co-defendants. The defendant, Kent Denny, objects to the court's ruling for three reasons. First, Denny claims that his statements and his brother's do not actually interlock because Jeff's statements are more comprehensive and detailed than Kent's statements and because Jeff's statements constitute a line of evidence that is relevant only to Jeff's culpability.

We review the inculpatory statements *de novo* to determine whether they were substantially similar on crit-

ical points. *State v. Smith,* 117 Wis. 2d 399, 412, 344 N.W. 2d 711, 717 (Ct. App. 1983). Upon review, we conclude that even if Jeff's statements were more detailed and comprehensive than Kent's, that does not prevent them from being interlocking. There are no apparent inconsistencies in the inculpatory statements, and the statements are substantially similar in terms of the crucial facts and an awareness of an overall plan. Although the statements are not identical, there is little doubt that the statements of the two brothers describe the same crime. *See United States v. Fleming,* 594 F.2d 598, 604 (7th Cir.), *cert. denied,* 442 U.S. 931 (1979). In response to the line of evidence objection, we are convinced that Jeff's statements about the disposal of the "murder shoes" coincides with Kent's admissions about the disposal of the "murder shirt" and corroborates their reliability. The statements suggest mutual activity to further the overall scheme of the crime and its concealment.[1]

---

[1] Kent Denny argues that the statements of Jeff Denny were not admissible under the conspiracy exclusion from the hearsay rule contained in sec. 908.01(4)(b)5, Stats., because the trial court failed to make the necessary factual findings of the existence of a conspiracy. Denny makes that argument in answer to the state's claim that the inculpatory statements were interlocking because they showed the "involvement of each [co-defendant] as to the crucial facts . . . and an awareness of an overall plan or scheme." *See Parker v. Randolph,* 442 U.S. 62, 67–68 (1979).

Our reading of the transcript, however, shows that the trial court explicitly found a continuing conspiracy following Mohr's death. In a response to a specific debate concerning this subject where the defendant told the court that it had not made any findings that a conspiracy existed or continued to exist following the death of Mohr, the court replied:

COURT: The testimony of Trent Denny is that about two or three weeks after Jeff had talked to him they talked with Lori about getting rid of the clothes and both said they had to get rid of the clothes. I'm not holding that the conspiracy ended when Christopher's death was terminated. Certainly then, the

Second, Denny asserts that the trial court's reliance on the *Parker* ruling is misplaced because a plurality decision cannot be given precedential authority when a "narrower" concurring opinion has been filed. We need not decide that point because the rule of the *Parker* plurality has been adopted by this court in *State v. Smith,* 117 Wis. 2d at 411–12, 344 N.W.2d at 716–17. The court in *Smith* held that interlocking co-defendants' statements are per se admissible. *Id.* at 412, 344 N.W.2d at 716–17. Therefore, the *Parker* rule is now the rule in this state, and we are bound to follow it.

Third, the defendant maintains that sec. 971.12(3), Stats., mandates severance whenever a co-defendant's inculpatory statements are to be used at trial notwithstanding the *Parker* decision. The statute, however, is based on the *Bruton* ruling. Because *Parker* is an exception to *Bruton,* it is also an exception here. We conclude that sec. 971.12(3) does not apply to a situation where there is testimony that both co-defendants made interlocking inculpatory statements.[2]

Denny challenges the denial of severance for one additional reason. He claims that severance was required because of the antagonistic defenses asserted by the co-defendants and cites *Jung v. State,* 32 Wis. 2d 541, 546, 145 N.W.2d 684, 687 (1966), *cert. denied,* 386 U.S. 999

acts of the two defendants after they disclosed their, their participation to others in the family and others of their friends and then asked for help to get rid of the clothes, I think it's all part of that one thing, and I will deny the motion here.

[2] Although we do not need to resolve whether adoptive admissions are an exception to the severance statute, sec. 971.12(3), Stats., we note that some of Kent Denny's statements qualify as adoptive admissions because they were responses to Trent Denny's questions about co-defendant Jeff Denny's statements.

(1967), in support of that proposition. *Jung* does not apply here, however, because it was not the defenses that were antagonistic but, rather, the tactics of respective counsel. Counsel differed several times on the degree of emphasis and on the lines of questioning. Although these differences represent different defense tactics, they do not constitute antagonistic defense theories. In fact, the same defense theory was pursued by both of the Denny brothers. The theory was that neither Kent Denny, nor his brother Jeff, perpetrated the murder and all of the state's witnesses who gave testimony about the defendants' inculpatory statements were liars or could not otherwise be considered credible witnesses. We conclude that defense counsel did not present antagonistic defenses but, rather, employed different tactics. We further point out that Wisconsin courts have been reluctant to find that assertions of antagonistic defenses justify severence. *See Haldane v. State*, 85 Wis. 2d 182, 190, 270 N.W.2d 75, 79 (1978). We hold that the trial court's denial of severance was not an abuse of discretion.

## *TRIAL COURT'S REFUSAL TO ADMIT CERTAIN EVIDENCE*

Part of Kent Denny's theory of the case was that he was not the perpetrator of the crime and his inculpatory statements were due to his proclivity for storytelling. He claims he had no motive to murder Mohr but others did. Denny attempted to present evidence by means of an offer of proof to support his theory that others had the motive to kill Mohr. At the same time, Denny sought to prove that he had a reputation as a liar, which would explain his inculpatory statements. The trial court refused to allow Denny to present evidence suggesting that others might have had a motive, ruling it irrelevant. Denny

challenges the trial court's rulings as a denial of his right to present a defense.

Denny correctly notes that even though the right to present witnesses in his own defense is a fundamental constitutional right, that evidence must be relevant to the issues being tried. *Milenkovic v. State,* 86 Wis. 2d 272, 286, 272 N.W.2d 320, 327 (Ct. App. 1978). He asserts, however, that if he can show how other people had a motive to murder Mohr, he can "establish the hypothesis of innocence." *See State v. Wedgeworth,* 100 Wis. 2d 514, 532, 302 N.W.2d 810, 820 (1981), quoting *Hicks v. State,* 47 Wis. 2d 38, 43, 176 N.W.2d 386, 389 (1970). Hence, the evidence is claimed to be relevant.

The general rule is that evidence of motive of one other than the defendant to commit the crime can be excluded when there is no other proof directly connecting that person with the offense charged. As stated in *People v. Green,* 609 P.2d 468, 480 (Cal. 1980):

It is settled, however, that evidence that a third person had a motive to commit the crime with which the defendant is charged is inadmissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense. . . . The rule is designed to place reasonable limits on the trial of collateral issues . . . and to avoid · undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects . . . . [Citations omitted.]

The *Green* court reasoned that general proof of opportunity and criminal disposition raises, at most, a bare possibility that a third party might be the culprit. We agree with the *Green* court's rationale explaining why there must be more than general proof of opportunity and

criminal disposition. The *Green* court stated that there must be, in addition, evidence directly connecting a third person with the offense charged. We accept that statement. We disagree only with the *Green* court's conclusion that such evidence must be *substantial*. We perceive this to be too strict a standard for the admissibility of such evidence and conflicts with our supreme court's pronouncements on the fundamental standards of relevancy. In our state, admission of testimony is allowed if the testimony tends to prove a material fact. *See* secs. 904.01 and 904.02, Stats.; *see also State v. Pharr*, 115 Wis. 2d 334, 344, 340 N.W.2d 498, 502 (1983). Pursuant to sec. 904.01, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. This rule does not say that the evidence must tend to prove a fact in a *substantial* way.

We are convinced that sec. 904.01, Stats., commands us to adopt a standard less severe than the California court; a better standard was developed in the early case of *Alexander v. United States*, 138 U.S. 353 (1891). In that case, the United States Supreme Court fashioned the "legitimate tendency" test. In other words, there must be a "legitimate tendency" that the third person could have committed the crime. *Id.* at 356–57. We believe that to show "legitimate tendency," a defendant should not be required to establish the guilt of third persons with that degree of certainty requisite to sustain a conviction in order for this type of evidence to be admitted. On the other hand, evidence that simply affords a possible ground of suspicion against another person should not be admissible. Otherwise, a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased—

degenerating the proceedings into a trial of collateral issues. The "legitimate tendency" test asks whether the proffered evidence is so remote in time, place or circumstances that a direct connection cannot be made between the third person and the crime. *Id.* at 356–57.

Thus, as long as motive and opportunity have been shown and as long as there is also some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances, the evidence should be admissible. By illustration, where it is shown that a third person not only had the motive and opportunity to commit the crime but also was placed in such proximity to the crime as to show he may have been the guilty party, the evidence would be admissible. *See Perry v. Watts*, 520 F. Supp 550, 557 (N.D. Cal. 1981), *aff'd sub nom. Perry v. Rushen*, 713 F.2d 1447 (9th Cir. 1983), or where a third person has committed or actively seeks to commit violent acts against the victim, or has threatened the victim in a manner not remote in time, place or circumstances, the evidence might likewise be admissible. *See Alexander* at 356–57. *See also Harrison v. State*, 83 S.W. 699, 702 (Tex. Crim. App. 1904).

Our decision to adopt the "legitimate tendency" test is supported by an old Wisconsin case, *Lasecki v. State*, 190 Wis. 274, 208 N.W. 868 (1926). In that case, the defendant claimed he was wrongly prevented from introducing evidence that a third party might have committed the murder for which he was charged. The defendant wanted to show that the victim conducted an illegal liquor business and made enemies. The court wrote:

This proof was offered for the purpose of raising a question in the minds of the jury as to whether some such enemy might not have been responsible for the death of Armstrong. The fact that some one else may have a motive to commit a crime does not make such proof admissi-

ble unless accompanied by proof *tending to connect* the person having such motive with the commission of the offense, *or* at least *tending to show* that such person was in the vicinity at the time that the crime was committed so that such person would have had an opportunity to commit the offense. [Emphasis added.]

*Id.* at 281–82, 208 N.W. at 871. Thus, while the *Lasecki* court vacillated between creating a standard requiring only motive and opportunity and a standard requiring motive, opportunity *and* a direct connection to the crime (such that no clear standard was established), the fact is that *Lasecki* did use the term "tendency." While our decision establishes a bright line standard requiring that three factors be present, i.e., motive, opportunity and direct connection, our holding is consistent with the *Lasecki* language regarding the term "tendency."

Using the "legitimate tendency" test, Denny's offer of proof was deficient. One proposed witness would have testified that Mohr "may have gotten into trouble with . . . a big drug dealer." There is neither motive nor opportunity shown here much less a direct connection between the drug dealer and the crime. This same proposed witness would also have testified that Mohr owed one Gary Peterson the sum of $130. Even assuming motive has been established, neither opportunity nor a direct connection to the crime was established. A second proposed witness would have testified that Mohr "may have had an enemy" in Bill Cudahy because Cudahy gave Mohr a shotgun in exchange for a controlled substance. Mohr sold the shotgun, allegedly making Cudahy angry. While motive has been established, no evidence of either opportunity or direct connection to the crime was proffered. We conclude that the trial court did not abuse its discretion in refusing to admit this testimony.

## TRIAL COURT'S REFUSAL TO TURN OVER CERTAIN INVESTIGATIVE REPORTS TO THE DEFENDANT

In the course of investigating the murder of Mohr, the police followed many different leads in an effort to identify suspects. Defense counsel requested copies of all written investigative reports to determine, in part, if the contents might support Kent Denny's theory that others had a motive to kill Mohr. In response, the district attorney turned over some of the reports but submitted others to the court for inspection. After the court reviewed the balance of the reports *in camera,* the court declared the contents irrelevant and refused to disclose them to defense counsel. On appeal, this court authorized defense counsel and the attorney general to read the investigative reports and to argue whether the trial court erred in its decision. Having read the reports, Denny claims that failure to allow his counsel to read the reports prior to trial prejudiced his case.

Questions concerning the relevance of particular evidence are to be determined by the trial court's exercise of discretion. This court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination. *Pharr,* 115 Wis. 2d at 342, 340 N.W.2d at 501. Before reaching that question, however, we note that the defendant frames this issue in terms of the state failing to disclose exculpatory evidence. We disagree with the defendant's characterization. In fact, the state relinquished sole possession of the evidence when it submitted the materials to the court. The state alleged that this evidence was not exculpatory and that its production at trial would merely create peripheral issues which would unduly distract the jury from the main issues. We are persuaded

that the state's willing production of the reports to the trial court distinguishes this situation from the kind of problem faced in *Rohl v. State,* 90 Wis. 2d 18, 279 N.W.2d 722 (Ct. App. 1979), *aff'd in part, rev'd in part,* 96 Wis. 2d 621, 292 N.W.2d 636 (1980), where exculpatory evidence was allegedly withheld. In that case, the state arguably kept information from the defendant and the court. The issue here is whether the *trial court* abused its discretion in finding that the contents of the police reports were not exculpatory, not whether the *state* failed in its duty to turn over exculpatory evidence. Having determined the correct posture of this issue, we now reach its merits.

The trial court stated during the hearing on pretrial motions, that its review of the sealed investigative reports in question did not disclose anything of importance to the trial. The trial court acknowledged that some of the persons identified in the reports were the same as those mentioned in the Denny proceedings but nonetheless found the information irrelevant even as to the credibility of witnesses. The trial court understood that defense counsel had been given copies of all those investigative reports that did supply relevant and possibly exculpatory information.

We have thoroughly reviewed the contents of the sealed investigative reports. We conclude that no exculpatory information existed which would have helped Denny in his pursuit of admissible evidence relating to third-party culpability. Most of the 236 pages show nothing more than an on-going investigation of the crime. None of that information would have been helpful either in the preparation or submission of admissible evidence in Denny's defense.

Denny's argument that there are numerous references to persons having information about the murder is of no

import; there is nothing exculpatory in any of that information. His claim that one person gave detailed descriptions of the wounds on the body is also of no moment because there is no hint of motive or opportunity which could be used by Denny in attempting to get this particular evidence before the jury.

Finally, Denny argues that the reports show names of those believed by others to be involved. In the majority of these instances, this information can be classified as nothing more than finger-pointing gossip. In only three instances can a motive to hurt Mohr be conceived. In the first, Gary Peterson threatened Mohr with harm for not repaying a loan. The problem is that Peterson was incarcerated at the time of the murder; he had no opportunity to commit the crime. In the second, Bill Cudahy is listed as having been angry with Mohr, but the report provides Denny with no more information than he had available in his offer of proof. Third, it was reported that someone thought one Randy Peterson might possibly be angry with Mohr because of Mohr's encroachment upon Randy's drug territory. There is nothing in the report, however, that would help Denny show a direct connection to the crime. In sum, none of the material would enhance the admissibility of his proffered evidence or bring up additional evidence. The trial court properly refused to allow inspection of the documents by the defendant's counsel.

Denny also claims that even if not exculpatory, the information would have been helpful to defense preparation and investigation. However, the state is under no constitutional obligation to provide the defense with discovery of helpful but nonexculpatory evidence. *See Britton v. State*, 44 Wis. 2d 109, 117–18, 170 N.W.2d 785, 789–90 (1969).

Finally, the defendant claims that two pages of the investigative materials show that a key prosecution witness

lied. We agree with the state that this characterization is incorrect and that this evidence has no impeachment value.

*By the Court.*—Judgment affirmed.